IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FILED**

DEC 3 0 2011

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

KENNETH COEN,

        Plaintiff,

v.

        Civil Action No. 1:11cv45
        (The Honorable Irene M. Keeley)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant" and sometimes"Commissioner") denying the Plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

## I. PROCEDURAL HISTORY

Plaintiff filed his application for SSI in April 2007, alleging disability since January 2, 2007, due to lower back injury and hepatitis C (R. 19-28, 129, 157, 161). Plaintiff's application was denied initially and upon reconsideration by the state agency (R. 87-88, 99-102). Plaintiff timely requested a hearing, which Administrative Law Judge Norma Cannon ("ALJ"), held on March 3, 2009, and at which Plaintiff, represented by counsel, Montie Van Nostrand, and Vocational Expert Larry Bell ("VE") testified (R. 33-84). On May 29, 2009, the ALJ entered a decision finding Plaintiff was not disabled because there was a limited range of light and sedentary jobs in the national and local

economies that he could perform (R. 19-28). Plaintiff appealed the ALJ's decision to the Appeals Council, which denied his request for review on February 11, 2011, making the ALJ's decision the final decision of the Commissioner (R. 1-7).

## II. FACTS

Plaintiff was born on February 18, 1961, and was forty-eight (48) years old at the time of the administrative hearing (R. 27). Plaintiff's past work included general carpentry work, "concrete work and . . . layout work" (R. 162). Plaintiff last worked in 2005 until he was "laid . . . off" (R. 161). Plaintiff had a twelfth-grade education (R. 37).

Plaintiff's December 4, 2006, Hepatitis Acute Panel (A, B, C) was negative (R. 289).

On January 10, 11, 12, 15, 16, and 26, 2007, Plaintiff was treated by a chiropractor (R. 284-88).

Plaintiff was treated by Dr. Kline on January 15, 2007, for a back injury caused by a fall. Plaintiff reported thoracic back pain at T9-L1 that radiated "up and down his back with the spasm and a little bit in his legs associated with some weakness in his legs because it hurt[] to move them, but no paresthesias." Dr. Kline treated Plaintiff's "inflammation with prednisone" and Percocet. Plaintiff was instructed to continue chiropractic treatment (R. 297).

On January 23, 2007, Plaintiff reported to Dr. Kline that he had pain in his right lower back and hip. Dr. Kline prescribed Flexeril (R. 298).

Plaintiff reported to Dr. Kline, on February 26, 2007, that his pain was "well" and he had returned to work as a painter. He worked for four (4) days (R. 299).

Dr. Kline prescribed Oxy IR for Plaintiff's low back pain on March 6, 2007 (R. 300).

Plaintiff's March 29, 2007, lumbar spine MRI showed "mild annual bulge at the level of the 4th lumbar interspace. There [was] some minimal disk protrusion at the level of the lumbosacral

interspace with some central neural compression at this level. Examination [was] otherwise negative" (R. 294, 305).

Plaintiff presented to Dr. Smith on May 9, 2007, for prescription renewal; he prescribed Dilaudid (R. 308, 329).

On May 31, 2007, Plaintiff was treated by Dr. Smith for herpes and low back pain. Dr. Smith noted Plaintiff had gone "to see [doctor] in Morgantown [who] recommended to continue [with] the PCP for now." Dr. Smith declined to prescribe medication until he received and reviewed the "report" from the pain clinic (R. 328).

On June 25 2007, Plaintiff presented to Minnie Hamilton Health Center with back pain. He requested medication. He was prescribed Dilaudid (R. 327).

Dr. Famularcano examined Plaintiff on June 29, 2007. Plaintiff reported that he injured his back five years earlier when he lifted a pipe. Dr. Famularcano noted Plaintiff's March 30, 2007, MRI "revealed mild annular bulge at the level of L4" and "some minimal disk protrusion on the level of the lumbosacral interspace with some central neural compression at this level." Dr. Famularcano also noted that Dr. Voelker had recommended "conservative management like physical therapy, TENS unit, use of nonsteroidal anti-inflammatory, avoidance of long term narcotics, and also referral for possible epidural injection." Dr. Famularcano noted Plaintiff reported that Dr. Kline had given him an epidural injection, prescribed Percocet, and then prescribed hydromorphone because that was "the only medication that [gave] relief to the pain" due to Plaintiff being positive for hepatitis C. Dr. Famularcano's examination of Plaintiff revealed "[m]arked tenderness on the level of L4 and L5[] and also on the right buttocks." Plaintiff "use[d] a cane for support, and he ha[d] a limp favoring the right leg." Dr. Famularcano found "full rumination of both upper extremities." Plaintiff's right leg had

fifteen (15) degrees of flexion, and his left leg had thirty (30) degrees of flexion. Plaintiff reported he experienced numbness and tingling in his right leg. Dr. Famularcano opined that Plaintiff "definitely ha[d] a discogenic disk disease and is experiencing constant or chronic pain. Fortunately, it responds to medication." Dr. Famularcano referred Plaintiff to Dr. Patel for pain management (R. 339). Plaintiff was prescribed hydromorphone (R. 338).

Plaintiff was treated at Minnie Hamilton Health Care Center on July 27, 2007, for discogenic disk disease. Plaintiff stated he "preferred to be referred to a pain management" physician for treatment. Plaintiff walked with a cane and a limp. He was prescribed hydromorphone. He was referred to a pain management clinic (R. 341).

On July 31, 2007, Dr. Sabio examined Plaintiff for disability determination services. Plaintiff's chief complaints were for low back pain and hepatitis C. Dr. Sabio reviewed Dr. Kline's January 15, 2007, diagnosis of lower thoracic and upper lumbar muscle spasms. Plaintiff stated that, in January, 2007, "he was bending over a ditch, he picked up a pipe, and he had severe back pain." Plaintiff's MRI showed degenerative disk disease of the lumbar spine. Plaintiff was scheduled to receive epidural injections. Plaintiff stated that he woke each morning "with severe pain in the lumbar spine and the lower thoracic spine." Plaintiff reported he had "to get under a hot shower to get some relief of the pain." Plaintiff described his pain as constant and increased with repetitive bending, stooping, lifting. Plaintiff reported his right leg "ha[d] given out." He could "ride in a car for about one hour" before he needed "to step out to relief (sic) the pain in his back." Plaintiff reported he was diagnosed with hepatitis C in 1993, which he "probably got . . . from tattoos." He complained of right, upper quadrant pain; he had no jaundice; he tired easily; he became "sore" when he medicated with Tylenol; he had no fatty food intolerance; he had no weight loss; he had no "swelling in his belly" (R. 311-12).

4

Dr. Sabio's examination of Plaintiff revealed the following: Plaintiff was alert and oriented, times three. His gait was normal and he used no assistive devices. Plaintiff was stable at station (R. 312). Dr. Sabio's examination of Plaintiff's HEENT, neck, cardiovascular, chest, abdomen, extremities, and spine produced normal results. Plaintiff's cervical spine range of motion "allow[ed] 60 degrees of flexion, 75 degrees of extension, lateral flexion [was] 45 degrees bilaterally, and rotation [was] 80 degrees bilaterally." Plaintiff's shoulder abduction and forward flexion were one-hundred, eighty (180) degrees bilaterally. His adduction was fifty (50) degrees bilaterally; internal rotation was forty (40) degrees bilaterally; and external rotation was ninety (90) degrees bilaterally (R. 313). Plaintiff's straight leg raising was sixty (60) degrees on the right and eighty (80) degrees on the left and was "restricted by pain in the lumbar spine." Plaintiff's lumbar spine flexion was forty-five (45) degrees and ten (10) degrees laterally to either side "restricted by pain in the lumbar spine." Plaintiff's hips "allow[ed] 100 degrees of flexion bilaterally; extension [was] 30 degrees bilaterally; abduction [was] 40 degrees bilaterally, and adduction [was] 20 degrees bilaterally." Plaintiff's knees "allow[ed] 90 degrees of flexion"; Plaintiff's ankles "allow[ed] 20 degrees of dorsiflexion and 40 degrees of plantar extension bilaterally" (R. 314). Plaintiff was neurologically intact; his sensory function to light touch and pinprick was intact throughout; his motor strength was 5/5 bilaterally; his deep tendon reflexes were 2/4; his Babinski reflex was negative; he could ambulate on his heels, toes, and heel-to-toe; he could stand on one leg at a time; he could squat "only halfway"; his fine manipulation movements were well preserved (R. 314).

Dr. Sabio's impression was for hepatitis C by history and degenerative disk disease (R. 314).

On August 7, 2007, Fulvio Franyutti, M.D., completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Franyutti found Plaintiff could occasionally lift and/or carry twenty (20)

pounds; frequently lift ten (10) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour work day; sit for a total of about six (6) hours in an eight (8) hour workday, and push/pull unlimited (R. 318). Dr. Franyutti found Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Plaintiff could never climb ladders, ropes or scaffolds (R. 319). Dr. Franyutti found Plaintiff had no manipulative, visual or communication limitations (R. 320-21). Dr. Franyutti found Plaintiff could tolerate unlimited exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation. Plaintiff should avoid concentrated exposure to extreme cold, vibration, and hazards (R. 321).

On August 24, 2007, Plaintiff was prescribed hydromorphone for low back pain by a physician at Minnie Hamilton Health Care Center (R. 342).

On September 26, 2007, Plaintiff reported to a physician at Minnie Hamilton Health Care Center that he experienced anxiety and sleeplessness. He was prescribed hydromorphone (R. 343).

On September 26, 2007, Plaintiff tested positive for opiates. It was noted that Plaintiff "had Sudafed for cough –might (sic) caused . . . [positive] result" (R. 335).

On October 24, 2007, Plaintiff was prescribed hydromorphone for low back pain by a physician at Minnie Hamilton Health Care (R. 347).

On November 6, 2007, Plaintiff was treated by Dr. Patel at the Pain Management Center. Plaintiff stated he had "chronic but recurrent back and hip pain" that had been present for eleven (11) months. Plaintiff's pain was "localized over lower back and radiating to the right hip and leg." Plaintiff described his pain as achy, dull, leg cramps, and "mostly at night." Plaintiff's pain "improve[d] some with conservative treatment including bed rest, analgesics (Hydro morphine) . . . ." Plaintiff described his pain as eight (8) on a scale of one (1) to ten (10). Upon examination, Dr.

Patel found "[t]enderness over sacroiliac joint area and lumbar para-spinal facet joint area present. Also lower lumbar spine tenderness [was] present with restricted spine movement with flexion, extension, and to some extent with lateral rotation." Plaintiff's straight leg raising test was positive at twenty-five (25) degrees. Dr. Patel observed Plaintiff was alert and oriented. He was positive for "distress due to severe lower back pain radiating to the right lower extremity." Dr. Patel noted Plaintiff's x-ray showed "[b]ulging disc at L4, central neural compression" and diagnosed "[b]ulging L4 disc, radiculopathy due to nerve root compression, degenerative disc disease, back and hip pain, sacro-ilitis." Dr. Patel prescribed nerve blocks, physical therapy, exercise program, and pain medications. Dr. Patel opined he "should be able to help the patient's pain condition" based on Plaintiff's pain and diagnosis. Dr. Patel noted Plaintiff's primary care physician would prescribe Plaintiff's narcotic pain medication; he administered a right sacroiliac joint injection (R. 462-63).

On November 28, 2007, Plaintiff reported to Dr. Smith that he had "been out of pain meds (for) 2 days." Plaintiff stated that he was to be treated by "Dr. Priscilla but [that] visit was cancelled." He "need[ed] something to help him through." Plaintiff reported he was experiencing "bowel accidents & anxiety."

On November 30, 2007, Plaintiff reported to a physician at Minnie Hamilton Health Care Center that the "epidural caused him excruciating pain." He was prescribed hydromorphone (R. 348).

On December 27, 2007, Plaintiff presented to Dr. Smith for refill of his Dilaudid. Dr. Smith informed Plaintiff that he "needs new PCP or no other narcotics" (R. 325). Dr. Smith prescribed hydromorphone (R. 326, 386).

Also on December 27, 2007, Plaintiff tested positive for opiates (R. 332, 334, 417-19).

On January 25, 2008, Plaintiff was prescribed hydromorphone by a physician at Minnie Hamilton Health System (R. 385).

On February 19, 2008, Porfirio Pascasio, M.D., completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Pascasio found Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour work day; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 351). Plaintiff could occasionally climb ramps and stairs; he could never climb ladders, ropes, or scaffolds. Plaintiff could occasionally balance, stoop, kneel, crouch, and crawl (R. 352). Dr. Pascasio found Plaintiff had no manipulative, visual, or communicative limitations (R. 353-54). Dr. Pascasio found Plaintiff should avoid concentrated exposure to extreme cold and hazards; Plaintiff's exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation was unlimited (R. 354).

On February 22, 2008, Bob Marinelli, Ed.D., completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had no medically determinable impairment (R. 358).

On March 25, 2008, Plaintiff presented to Dr. Famularcano for evaluation for kidney stones. Plaintiff reported he had received an epidural steroid injection for his back pain. Plaintiff reported difficulty with bending, doing house and yard work, "getting in and out of the car . . . lifting, sitting, stairs and twisting motion." Plaintiff's examination was "[u]nremarkable with exception of chief also the chronic low back pain." Dr. Famularcano diagnosed low back pain and kidney stone. Dr. Famularcano stressed the "importance of daily adherence of medication administration" (R. 374). Dr. Famularcano prescribed Bactrim, hydromorphone, and Duragesic patch (R. 375).

On April 24, 2008, Plaintiff presented to Dr. Famularcano for evaluation of pain. Plaintiff reported difficulty with "bending, getting in and out of the car, getting in and out of a chair, kneeling, lifting, putting on socks and shoes, sitting, stairs, twisting motion, walking and weight bearing." Plaintiff reported he was "unable to participate in baseball, basketball, biking, football, golf, hockey, racquetball, running, skiing, soccer, softball, tennis and volleyball." Plaintiff was positive for back pain. Plaintiff medicated with Bactrim, Duragesic patch, and hydromorphone. Plaintiff smoked one package of cigarettes per day. Upon examination, Dr. Famularcano found Plaintiff was five (5) feet, eleven (11) inches tall and weighed two-hundred, thirty-six (236) pounds. Plaintiff was "pleasant, alert, oriented and in no apparent distress." Plaintiff was positive for paraspinal muscle spasm and SI joint tenderness. Dr. Famularcano diagnosed low back pain (R. 372). Dr. Famularcano instructed Plaintiff to "walk at least a mile a day for exercise" (R. 373).

On April 24, 2008, Dr. Famularcano completed a West Virginia Department of Health and Human Resources Medical Review Team (MRT) General Physical (Adult) of Plaintiff. Dr. Famularcano noted Plaintiff's posture was poor and he walked with a limp due to back pain (R. 377). Dr. Famularcano opined that Plaintiff had chronic back pain caused by discogenic disk disease. Plaintiff was positive for "tenderness over the L5 joint" and had paraspinal muscle spasm. Dr. Famularcano found Plaintiff could not work full time. Dr. Famularcano found that, within a work situation, Plaintiff should avoid lifting, bending, standing and sitting "for a long time." Dr. Famularcano opined Plaintiff's "[d]uration of inability to work full time" was indefinite (R. 378). Dr. Famularcano based her opinion on a "MRI - bulging disk lumbar" and specialist's consultations that had been "done in the past." Dr. Famularcano noted Plaintiff medicated with a Duragesic patch and

hydromorphone. Dr. Famularcano opined that Plaintiff was "at the stage that can't perform customary work or employment due to the limitation he can do due to his back problem" (R. 379).

On May 22, 2008, Plaintiff presented to Dr. Famularcano with complaints of lumbar pain. Dr. Famularcano found Plaintiff had "difficulty with bending, kneeling , lifting, stairs, standing, twisting motion, walking and weight bearing." Plaintiff was oriented and in no distress; he had L5 joint tenderness, paraspinal muscle spasm, and S1 joint tenderness. Plaintiff's joints and muscles were "unremarkable." Dr. Famularcano diagnosed low back pain (R. 415). Plaintiff was instructed to exercise regularly (R. 416).

On June 19, 2008, Plaintiff presented to Dr. Famularcano with complaints of back pain. Dr. Famularcano found Plaintiff had "difficulty with bending and lifting." Plaintiff was in no distress; he had L5 joint tenderness and S1 joint tenderness. Plaintiff's joints and muscles were "unremarkable." Plaintiff's neurological examination was "unremarkable." Dr. Famularcano diagnosed low back pain (R. 413). Plaintiff was instructed to exercise regularly (R. 414).

On July 16, 2008, Plaintiff presented to Dr. Famularcano with complaints of back pain. Dr. Famularcano found Plaintiff had "difficulty with bending, kneeling, lifting, stairs, standing, twisting motion, walking and weight bearing." Plaintiff was in no distress; he had "L5 tenderness, paraspinal muscle spasm, S1 joints tender and paraspinal tenderness" (R. 411). Plaintiff's joints and muscles were "unremarkable." Plaintiff's muscle tone was normal. Plaintiff was instructed to exercise regularly; he was prescribed hydromorphone and Duragesic patch (R. 412).

On August 14, 2008, Plaintiff presented to Dr. Famularcano for an evaluation of his pain. Dr. Famularcano found Plaintiff had "difficulty with bending, walking and weight bearing." Plaintiff was positive for numbness. Plaintiff was in no distress. Plaintiff was positive for "L5 joint tenderness, S1

joints tender and paraspinal tenderness." Plaintiff's neurological exam was unremarkable. Dr. Famularcano diagnosed low back pain (R. 409). Dr. Famularcano instructed Plaintiff to "get regular exercise." Dr. Famularcano prescribed hydromorphone and Duragesic patch (R. 410).

On September 5, 2008, Plaintiff presented to United Summit Center with complaints of stress and anxiety. Plaintiff reported he had degenerative disk disease, liver disease, and hepatitis C. Plaintiff stated his stress was caused by his "quitting work." Plaintiff reported he had not worked in two (2) years. Plaintiff's mental status evaluation revealed the following: woke five (5) or six (6) times per night; poor appetite; had lost thirty (30) pounds in the past fourteen (14) months; felt anxious; depressed affect and mood; irritable and moody "at times"; experienced a "big decrease in interest in playing his music"; worried excessively; poor eye contact; tired; good concentration; and good memory. Plaintiff was diagnosed with depressive disorder, NOS (R. 395).

On September 10, 2008, Plaintiff presented to Dr. Famularcano for follow-up treatment of pain and with complaints of anxiety. Plaintiff stated his pain was located in the lumbar spine. Dr. Famularcano found Plaintiff had "difficulty with bending, house and yard work, kneeling, stairs, standing, twisting motion, walking and weight bearing." Plaintiff was in no distress (R. 407). Dr. Famularcano's examination of Plaintiff revealed "L5 joint tenderness, 11 joint tender and paraspinal tenderness." Dr. Famularcano's "[i]nspection and palpation of bones, joints and muscles [was] unremarkable." Plaintiff's muscle tone was normal (R. 405). Dr. Famularcano diagnosed low back pain. Dr. Famularcano instructed Plaintiff to exercise regularly, drink plenty of fluids, and diet. Dr. Famularcano prescribed hydromorphone and Duragesic patch. Dr. Famularcano informed Plaintiff he was "allow[ed] only light carrying and lifting and modify activities of daily living based solely upon allowing for mild symptoms" (R. 408).

On September 26, 2008, Plaintiff began counseling at United Summit Center for "depression, withdrawal, guilt, anxiety, hopelessness, agitation, low energy, decreased sleep, and loss of interest" (R. 388). It was noted that Plaintiff had a "history of going in and out of jail for felony offenses" and he had "difficulty gaining employment due to the number of felonies he has" (R. 389).

On October 7, 2008, Plaintiff presented to Dr. Famularcano with complaints of pain in his right hip, back and right buttock. Dr. Famularcano found Plaintiff had "difficulty with bending, house and yard work, kneeling, stairs, standing, twisting motion, walking and weight bearing" (R. 404). Dr. Famularcano's examination of Plaintiff revealed "L5 joint tenderness, S1 joint tender and paraspinal tenderness." Dr. Famularcano's "[i]nspection and palpation of bones, joints and muscles [was] unremarkable." Plaintiff's muscle tone was normal (R. 405). Dr. Famularcano diagnosed low back pain. Dr. Famularcano instructed Plaintiff that "exercise, physical therapy, and other non-medicinal therapies [were] important parts of the treatment plan . . . ." Dr. Famularcano prescribed hydromorphone and Duragesic patch. Dr. Famularcano informed Plaintiff that "early refills and/or replacement of lost prescriptions may not be performed . . ." (R. 406).

A report of Plaintiff's evaluations of December 3 and December 18, 2008, was completed by Joseph Richard, Ed.D. on December 18, 2008. Dr. Richard noted Plaintiff lived on "the family farm in Gilmer County." Plaintiff was employed as a cab driver at the time of the evaluations. Plaintiff stated he took Seroquel as a sleep aid, but he "often [woke] up during the night." Plaintiff reported he medicated his back pain with hydromorphone and he was positive for hepatitis C, which was "probably the result of a very significant substance abuse history, which began at age 14." Plaintiff's past history of drug abuse included marijuana, amphetamines, and cocaine. Plaintiff reported he had

been a "severe alcoholic." Plaintiff reported having been married four times, twice to the same woman; he had no children (R. 390).

Dr. Richard noted Plaintiff had graduated high school and had "technical training for hydraulics in the military." Plaintiff also had a "certification in plumbing." Plaintiff stated his main work had been "in construction, doing carpentry and concrete work." Dr. Richard noted Plaintiff "had been incarcerated a number of times, beginning at age 21 for one year for Forgery and Uttering . . ., two years for Armed Robbery . . ., at age 24, four years for a Probation Violation . . ., at age 34, another year at age 44 for Probation Violation." Plaintiff completed a two-and-a-half (2 ½) year prison program, "which emphasized coping skills." Plaintiff lived with his mother on a six-hundred (600) acre farm "that was given to him by his family" (R. 391).

Dr. Richard administered the Kaufman Brief Intelligence Test. Plaintiff was in the fifty-eighth (58th) percentile for vocabulary; sixty-sixth (66th) percentile for matrices; and sixty-third (63rd) percentile for full-scale composite. Dr. Richard found Plaintiff's overall performance "[fell] well within the average range" (R. 391). Dr. Richard administered the Wide Range Achievement Test – Third Revision. The results were as follows: reading, standard score 109, post high school; spelling, standard score 100, high school; and arithmetic, standard score 97, high school. Dr. Richard noted Plaintiff's "achievement is commensurate with his school aptitude." Dr. Richard found that the "[r]esults of the mental status evaluation indicate that [Plaintiff] has intact immediate and delayed recall, as well as recent and remote memory." Dr. Richard found Plaintiff was oriented as to person, time and place. His affect and behavior were good; he showed no evidence of thought disorder. Plaintiff "denied most symptoms of anxiety, with some symptoms of depression." Dr. Richards

diagnosed depressive disorder, NOS; Plaintiff's GAF was fifty-five (55) (R. 392). Dr. Richards recommended Plaintiff "receive individual counseling" (R. 393).

On December 2, 2008, Plaintiff reported to Dr. Famularcano that he had fallen and "hit his left lumbar" area. Dr. Famularcano noted Plaintiff had difficulty with "bending, house and yard work, kneeling, lifting, stairs, standing, twisting motion, walking and weight bearing" (R. 401). Upon examination, Dr. Famularcano found Plaintiff was in no distress. He was positive for "L5 joint tenderness, S1 joint tender and paraspinal tenderness." Plaintiff's muscle tone was normal; his neurological examination was normal (R. 402). Plaintiff was "instructed that exercise, physical therapy, and other non-medicinal therapies" were "important parts of the treatment plan . . . ." Dr. Famularcano prescribed hydromorphone and Duragesic patch. Dr. Famularcano informed Plaintiff that "early refills and/or replacement of lost prescriptions may not be performed . . . ." Plaintiff was instructed to exercise regularly and diet (R. 403).

On January 20, 2009, Dr. Famularcano evaluated Plaintiff for pain. Dr. Famularcano found Plaintiff had "difficulty with bending, house and yard work, kneeling, stairs, standing, twisting motion, walking and weight bearing" (R. 398). Dr. Famularcano's examination of Plaintiff revealed "L5 joint tenderness, S1 joint tender and paraspinal tenderness." Dr. Famularcano's "[i]nspection and palpation of bones, joints and muscles [were] unremarkable." Plaintiff's muscle tone was normal. Dr. Famularcano diagnosed low back pain. Dr. Famularcano instructed Plaintiff that "exercise, physical therapy, and other non-medicinal therapies are important parts of the treatment plan . . . ." Dr. Famularcano prescribed hydromorphone and Duragesic patch. Dr. Famularcano informed Plaintiff that "early refills and/or replacement of lost prescriptions may not be performed . . ." (R. 400).

On March 5, 2009, Dr. Famularcano completed a "Primary Care Physician Questionnaire." Dr. Famularcano noted she had been treating Plaintiff since March, 2008, and had last examined Plaintiff on January 20, 2009. Dr. Famularcano noted Plaintiff's "past relevant medical history" was for kidney stones; her diagnosis was "in constant pain in his back and in his legs" (R. 421). Dr. Famularcano listed no clinical findings, laboratory tests or other data on which she based her diagnosis. The impairments and symptoms alleged by Plaintiff and listed by Dr. Famularcano were chronic low back pain with radiculopathy, kidney stones, degenerative disc disease of his lumbar spine, hepatitis C, and chronic fatigue (R. 422). Dr. Famularcano found Plaintiff could not walk or stand most of the time, lift fifty (50) pounds frequently, or lift one-hundred (100) pounds occasionally. Dr. Famularcano found Plaintiff could perform light work, which included a "significant amount of walking and standing, lifting 10 pounds frequently and up to 20 pounds occasionally, or sitting most of the time pushing and pulling"; however, Dr. Famularcano found Plaintiff could not perform sedentary work, which included "[s]itting most of the time, walking and standing occasionally, lifting no more than (sic) 10 pounds." Dr. Famularcano opined that Plaintiff was "maybe able to do some paper work, sitting down for about" one (1) hour." Dr. Famularcano found Plaintiff "[m]ust . . . alternate positions frequently . . . [d]ue to exacerbation of pain when in one position for long period of time" (R. 423). Dr. Famularcano found Plaintiff needed a sit-stand option. Plaintiff could sit at one time for thirty (30) minutes; stand at one time for thirty (30) minutes; and walk at one time for thirty (30) minutes. Dr. Famularcano found that Plaintiff could be "up on his[] feet" for two (2) hours "[i]f alternately walking and standing were combined." Dr. Famularcano found Plaintiff could sit upright for one (1) hour in an eight (8) hour workday. Dr. Famularcano opined it would be "advisable or necessary for the [Plaintiff] to recline or lie down during the day – with feet up" (R. 424). Dr. Famularcano found it

would "be advisable or necessary for the [Plaintiff] to have frequent rest periods from work during the day. . . . [a]s needed." Dr. Famularcano found Plaintiff could infrequently climb, balance, stoop, bend, kneel, crouch, crawl, stretch, reach, and squat during an eight (8) hour work day (R. 425). Dr. Famularcano found Plaintiff's was unlimited in his exposure to noise; should avoid concentrated exposure to excessive humidity, cold or hot temperatures, fumes, dust, and environmental hazards; should avoid all exposure to machinery, jarring or vibrations. Dr. Famularcano found Plaintiff would experience chronic pain, which would be severe, and intermittent pain, which would be severe. Dr. Famularcano found Plaintiff needed no assistive devices for ambulation (R. 426). Dr. Famularcano found Plaintiff had to frequently elevate his feet because he could not "stand for a long period of time." Plaintiff could not use his feet/legs for repetitive movements as part of a job because he "experienced pain in long standing & sitting" (R. 427). Dr. Famularcano found Plaintiff could perform simple grasping and handling, arm controls, fine manipulation and fingering in performing repetitive tasks in a job in the "AM" portion of the work day. Dr. Famularcano found Plaintiff had loss of grip strength in his hands, bilaterally, but no numbness. Dr. Famularcano found Plaintiff could not sit upright for "prolonged periods of time at a desk, console, etc. . . ." due to his experiencing "severe back pain in sitting for long period of time." Dr. Famularcano found Plaintiff would be absent from work more than twice a month. Dr. Famularcano found Plaintiff had no "degree of 'functional overlay'"; specifically, Plaintiff had no mental impairment that, in combination with his other impairments, resulted in a greater degree of disability (R. 428). Dr. Famularcano found Plaintiff was incapable of performing any full-time job and was specifically incapable of performing any full-time work from January 2, 2007, to the date of the questionnaire. Dr. Famularcano opined that Plaintiff was unable to work "[d]ue to pain . . . pt. experienced due to abnormality of lumbar spine" (R. 429).

16

On May 27, 2009, Plaintiff presented to Dr. Whitehair for a follow-up examination. Dr. Whitehair noted Plaintiff had been "dismissed from . . . [the Minnie Hamilton pain clinic] for alleged misuse of narcotic medication - pt state[d] that he had taken one of his sister's lortab prior to his office visit there as he had been out of his own pain medication." Plaintiff complained of worsening low back pain and numbness in his leg. Plaintiff stated that "pain [was] helped with prescription pain medications." Dr. Whitehair's examination of Plaintiff produced normal results except for low back pain and right leg numbness. Plaintiff's mood was stable (R. 526). Plaintiff had functional ranges of motion in all four extremities; his strength was equal throughout; his straight leg raising test was positive; his reflexes were 2/4 bilaterally; his peripheral pulses were equal and adequate. Plaintiff was diagnosed with low back pain with neuropathy. He was prescribed hydromorphone and Quetiapine. Dr. Whitehair noted this was "likely the last time that [she] [would] fill narcotic prescription." Plaintiff's depression was stable (R. 527-28).

On June 24, 2009, Plaintiff presented to Dr. Whitehair for prescription refills. Plaintiff stated his back pain was worsening; it radiated down his right leg. Plaintiff had mowed his grass three days earlier. Plaintiff requested a MRI of his back; it was scheduled. Dr. Whitehair diagnosed chronic back pain with radiculopathy and prescribed hydromorphone and Toradol (R. 524-25).

On July 1, 2009, Plaintiff presented to Dr. Whitehair for a physical examination. Plaintiff stated he was willing "to do pt for back pain – has tried in the past – didn't help." Plaintiff also stated he had "tried nerve blocks – no help in the past." A review of Plaintiff's systems produced normal results, except he stated he had chronic back pain. Dr. Whitehair noted Plaintiff's mood was stable. Plaintiff was diagnosed with chronic back pain, hepatitis C, and depression. Dr. Whitehair ordered

blood work; she prescribed hydromorphone; she noted Plaintiff was "aware will no longer fill narcotics at this clinic" (R. 523).

On July 8, 2009, a MRI of Plaintiff's lumbar spine was made at Braxton County Memorial Hospital. It showed "degenerative changes with diffuse disc bulges L4-5 and L5-S1." There was no "disc herniation or spinal stenosis" (R. 519, 529).

On August 26, 2009, Plaintiff presented to Stonewall Jackson Memorial Hospital emergency department with complaints of "red splotches," pain in his hand, elbow, and shoulder joint pain, pain in the bottom of his neck, and lower leg numbness (R. 532). Plaintiff "stated [he] was mowing grass Sat & Sunday [in] shorts then rash noted." He experienced increased swelling (R. 534). Plaintiff's provisional diagnosis was for "leg rash with diffuse polyarthritis of unclear etiology most likely secondary to some type of viral infection"; chronic back pain; history of hepatitis C. Dr. Orvik noted Plaintiff's "[l]aboratory studies were actually fairly unremarkable." Plaintiff's liver enzymes were "slightly elevated." Plaintiff's chest x-ray was normal (R. 540). A biopsy of Plaintiff's left leg showed "a leukocytoclastic vasculitis" (R. 532, 562). Plaintiff's neurological examination was within normal limits; his extremities were positive for bilateral pedal edema and rash (R. 532). Plaintiff was admitted to the hospital (R. 538). Plaintiff's final diagnosis was for "[a]cute viral infection with diffuse polyarthritis"; history of hepatitis C; chronic back pain (R. 540). Plaintiff's prescriptions for hydromorphone, Oxycodone, and Seroquel were continued. Plaintiff was prescribed Solu-Medrol and Rocephin. Dr. Orvik noted Plaintiff "improved dramatically" while hospitalized. Dr. Narla "ordered numerous rheumatologic testing which were mostly unremarkable." Plaintiff was discharged on August 31, 2009, to home, with instructions to continue care with his regular physician and to be evaluated and treated for hepatitis C (R. 541).

On September 2, 2009, Plaintiff presented to Dr. Whitehair with complaints of swelling joints and rash. Plaintiff stated he experienced leg swelling, swollen ankles, "black/blue" ankles, and rash on his lower extremities. Plaintiff's swelling had improved in his ankles. He had improved "on steroids." Plaintiff stated he had been diagnosed with rheumatoid arthritis. Dr. Whitehair noted Plaintiff had "never been evaluated by gastroenterologist or infectious disease doctor for hep C" (R. 570). Plaintiff reported his back pain was better. Plaintiff's mood and affect were stable. Plaintiff's examination was normal; he had no ankle swelling. Dr. Whitehair diagnosed petechiae, thrombocytopenia, and hepatitis C. Dr. Whitehair noted Plaintiff's thrombocytopenia had improved; she increased Plaintiff's prednisone (R. 571).

Plaintiff returned to Dr. Whitehair on September 9, 2009, and reported that Dr. Lonasso informed Plaintiff that "biosy (sic) was vasculitis and that definitely has rheumatoid arthritis based on biopsy results." Plaintiff's rash and swelling were "resolved" with prednisone. Plaintiff requested a prescription for Dilaudid for one (1) week until "his appt with the pain clinic." Dr. Whitehair prescribed Dilaudid. Plaintiff stated he could not "function due to pain without the pain medications." Plaintiff reported he had been "working in the garden – has been digging potatoes." Dr. Whitehair noted Plaintiff's MRI showed mild degenerative changes in his back. Dr. Whitehair listed Plaintiff's "active problems" as chronic back pain, depression, hepatitis C, and throbocytopenia (R. 573). Plaintiff's examination was normal except for chronic back pain. Plaintiff's mood and affect were stable. Dr. Whitehair noted that the prescription for Dilaudid would not be refilled "anymore after today under [any] circumstances here at this clinic" and that Plaintiff "voice[d] understanding" (R. 574). An addendum to Dr. Whitehair's September 9, 2009, office notes read that Plaintiff "state[d] that he is following with USC – reports that his mood is good on current medications . . ." (R. 575).

The September 8, 2009, x-ray of Plaintiff's left foot showed "a small sub-calcaneal spur" (R. 568). Dr. Anderson noted that Plaintiff had requested an epidural injection for relief of his "severe pain, numbness, burning and tingling L foot which [woke] him up and prevent[ed] him from sleeping." Plaintiff reported he got "nearly 2 wks relief out of this." Dr. Anderson found "paresthesias BL in a stocking distribution from the ankle mortis to the toes." Plaintiff's neuropathy was stable. Plaintiff received the injection (R. 567).

The September 12, 2009, CT scan of Plaintiff's abdomen and pelvis was made. The abdominal CT scan showed no acute abnormality; "[n]odular liver contour suggestive of hepatocellular disease"; splenomegaly "with possible upper abdominal varices," which suggested portal hypertension; and small abdominal nodes of uncertain significance. The pelvic CT scan was negative (R. 582).

Plaintiff was evaluated by Dr. Brager for thrombocytopenia and hepatitis C on September 23, 2009. Dr. Brager noted Plaintiff's platelets were "57 - 97,000" during Plaintiff's hospitalization in August, 2009. Plaintiff reported increased bruising, "but no major bleeding." Plaintiff reported recent weight loss, decreased energy, fatigue, abdominal pain, nausea, vomiting, joint pain, and bruising easily. Plaintiff reported he smoked one package of cigarettes per day; had worked as a plumber; no longer worked because he was disabled (R. 580). Dr. Berger found Plaintiff's "[i]nspection and palpation of the skin and subcutaneous tissues of head, neck, chest, breast, back, abdomen, genitalia and extremities [were] without rashes, lesions, ulcers, photo damage." Plaintiff's cranial nerves were grossly intact. Plaintiff's deep tendon reflexes were "2+4+ and symmetrical." He had no Babinski or clonus. Plaintiff's sensation was normal to touch, pinprick and vibration. His proprioception was normal. Plaintiff was oriented, times four. His mood and affect were appropriate. Dr. Berger assessed thrombocytopenia, which was "likely due to splenomegaly from portal HTN and cirrhosis/hepatitis."

Dr. Berger opined he "need[ed] to review recent abd CT to confirm splenomegaly." Dr. Berger also assessed hepatitis C, vasculitis/arteritis, and pain in abdomen, due to enlarged liver. Plaintiff requested narcotic pain medication. Dr. Berger prescribed Dilaudid and instructed Plaintiff to return in six (6) months (R. 581).

On September 26, 2009, Plaintiff was admitted to Stonewall Jackson Memorial Hospital for vasculitis and increased redness in his lower extremities, diffused tenderness, purpuric rash, and increased redness (R. 585, 598). Plaintiff's chief complaints were for "[e]dema, nonpitting, to bilat, lower extremities. Spots/petechiae noted on bilat lower extremities, extends to groin. Legs are painful." It was noted that Plaintiff's past medical history included hepatitis C, degenerative disk disease, and rheumatoid arthritis. The examination of Plaintiff's extremities and back and his neurological examination produced normal results (R. 590). Plaintiff's musculoskeletal examination produced pain (R. 594). Plaintiff was treated with intravenous steroids (R. 600).

On September 27, 2009, Dr. Sabbagh noted Plaintiff's leg pain and rash had "slightly improved"; he was prescribed prednisone; his Solu-Medrol was discontinued due to elevated glucose. Dr. Sabbagh diagnosed acute vasculitis, hyperglycemia, history of back pain, and anxiety (R. 607).

On September 28, 2009, Dr. Sabbagh noted the redness in Plaintiff's legs had improved and that Plaintiff "otherwise had chest pain." Plaintiff was prescribed prednisone and Glucophage. Plaintiff was to "follow up with rheumatology" (R. 608).

On October 5, 2009, Plaintiff was admitted to Stonewall Jackson Memorial hospital for vasculitis, cellulitis, and hepatitis C (R. 663). Plaintiff complained of bilateral lower extremity pain and swelling. Plaintiff was positive for "some spreading erythema." Plaintiff was treated with steroids and antibiotics. Plaintiff was positive for edema and medicated with Lasix. Plaintiff was alert and

could ambulate independently (R. 678, 679). Plaintiff reported bilateral hand numbness and weakness and easy bruising and bleeding. Plaintiff stated he could no longer work as a plumber, but he gardened. Plaintiff reported he did not consume alcohol; he smoked; he had never used intravenous drugs. Plaintiff was in no acute distress (R. 680). Plaintiff's examination was normal, except for "erythematous rash over the bilateral lower extremities." Plaintiff had normal strength and sensation in his bilateral upper and lower extremities; he reported pain in his lower extremities (R. 681). Dr. Williams diagnosed vasculitis "and likely secondary cellulitis of the bilateral lower extremities" and thrombocytopenia that was "likely related to his hepatitis C" (R. 682). It was noted that Plaintiff "move[d] all extremities well. Gait [u]nsteady. Needs assistance of one or more persons. Uses cane. Generalized body weakness" (R. 747). Plaintiff was discharged on October 8, 2009 (R. 678).

Plaintiff underwent an upper endoscopy at United Hospital Center on December 22, 2009. Dr. Pickholtz noted Plaintiff had hepatitis C for the past twenty (20) years, which was a result of intravenous drug abuse, and it had never been treated. Plaintiff medicated with Dilaudid for liver pain (R. 767). Dr. Pickholtz's examination of Plaintiff revealed he was alert and in no distress; he was not jaundiced; his thyroid was not enlarged; he had a systolic ejection murmur; and his spleen was possibly enlarged. Dr. Pickholtz opined he "believe[d] [Plaintiff] had splenomegaly" (R. 768).

On December 14, 2009, Plaintiff presented to Lively Health Care Center for chronic pain, edema, and hepatitis C (R. 784). Plaintiff entered into a Chronic Narcotic/Medication Contract with Lively Health Care Center for lumbar pain and hepatitis C (R. 787).

On December 28, 2009, Plaintiff reported to Lively Health Care Center that he had experienced back pain; he had been shoveling snow. Plaintiff reported he had "finished" the prescribed Oxycodone. He was instructed to rest his back; he was prescribed Dilaudid (R. 790).

On January 25, 2010, Plaintiff reported to Lively Health Care Center for follow up to his pain care. He reported that Dilaudid was "relieving pain well." Plaintiff was prescribed Dilaudid (R. 791).

On March 5, 2010, a CT scan was made of Plaintiff's abdomen. It showed splenomegaly; celiac axis lympnadenopathy, nonspecific; and cyst in the lower pole of the right kidney (R. 780). An ultrasound of Plaintiff's abdomen was made. It showed splenomegaly; limited midline structures; and small lower pole cyst in right kidney (R. 781).

Plaintiff reported to Lively Health Care Center on March 23, 2010, for follow up for his chronic pain and hepatitis C. Plaintiff reported his "[p]ain okay on Dilaudid." Plaintiff was prescribed Dilaudid (R. 792).

On May 21, 2010, Plaintiff presented to Lively Health Care Center for refill of pain medication prescriptions. Plaintiff was diagnosed with chronic pain, bursitis, and allergic rhinitis (R. 814).

Plaintiff telephoned the Lively Health Care Center on June 17, 2010, and requested a refill of hydromorphone because he was "going out of town for a week" (R. 815).

On July 21, 2010, Plaintiff presented to Lively Health Care Center for follow up to his chronic pain and hepatitis C. He was prescribed Dilaudid (R. 816).

Plaintiff telephoned the Lively Health Care Center on August 8, 2010, and requested a refill of his pain medication prescription. Dr. Williams prescribed Dilaudid (R. 817).

Plaintiff telephoned the Lively Health Care Center on September 17, 2010, and requested a refill of his pain medication. Dr. Williams honored the request and noted that Plaintiff "need[ed] seen for further refills" (R. 818).

Plaintiff presented to Lively Health Care Center on October 18, 2010, for follow up evaluation of his chronic pain and hepatitis C. Plaintiff was prescribed Dilaudid (R. 819).

On October 21, 2010, Plaintiff had a CT scan made of his neck (R. 798). It showed "[m]ultiple small lymph nodes neck bilaterally, although somewhat more numerous in number than usually expected. Largest is 1 cm size. Solitary left supraclavicular lymph node also demonstrated 8mm site. Based on the abdomen findings, this could be neoplastic based on the number of lymph nodes but nonspecific inflammatory reactive is also in the differential with only borderline large size" (R. 799).

Also on October 21, 2010, Plaintiff had a CT scan of his chest made. It showed "[n]o lymphadenopathy, mass, or lung infiltrates" (R. 800-01).

On November 2, 2010, Dr. Elliott completed a hematology/oncology clinic consultation report of Plaintiff. Plaintiff reported he experienced "tiredness, weakness, exertion and nausea and occasional swelling of both lower extremities." Plaintiff stated he had been admitted to the hospital five (5) times from June, 2009, through October, 2009. Plaintiff reported weight gain and pain in his upper abdomen, "more on the right side, but there [was] also pain in the left upper abdomen." Dr. Elliott noted that "[p]art of the picture [was] also complicated by the history of drug overdose, drug abuse and intravenous drug injection in the past." Plaintiff reported abnormal liver function, cirrhosis of the liver, and enlarged lymph nodes in his abdomen. Plaintiff's past surgical history was for tennis elbow repair and repair for knife cut to his neck (R. 802). Plaintiff reported he was seeking disability due to back pain; he stated he had spinal stenosis (R. 803).

Plaintiff described his symptoms as "night sweats, feeling of weakness, tiredness, and exertion" and elevated temperature. Plaintiff stated he vomited "at times" and had abdominal pain. Plaintiff had no headache; he reported he had lost thirty (30) pounds. Plaintiff reported he medicated with hydromorphone (R. 803).

Upon examination, Dr. Elliott found Plaintiff's HEENT, neck, and iguinal area were normal. Plaintiff had diminished movement with normal breath sounds of his chest. Plaintiff's spleen was palpable; his abdomen was moderately distended; he had edema in both lower extremities; he had no focal neurologic deficit; he was tremulous. Dr. Elliott opined she "believe[d] [Plaintiff] [was] still under the influence of some sedative agent" (R. 803). Dr. Elliott's assessment was for thrombocytopenia, history of hepatitis C, cirrhosis of the liver, and enlarged spleen (R. 803). Dr. Elliott noted there was no "positive finding for lymphoma at this time" (R. 804).

Also on November 2, 2010, Dr. Elliott's office phoned the Lively Health Care Center to report that Plaintiff was "asking them for pain meds, telling Dr. Elliott that you will not increase" his dosage. It was also reported that Plaintiff "told them that he needs them to give him phenergan because you wouldn't give it to him. . . . They tried to tell him they are not treating his pain at this time" (R. 820).

Plaintiff's November 24, 2010, upper gastrointestinal test was normal (R. 809). Plaintiff's abdominal ultrasound showed no abnormalities (R. 811-12).

Administrative Hearing

Plaintiff testified he drove less than one-hundred (100) miles per week (R. 37). Plaintiff drove to the grocery store, to shop for clothes, or to buy cigarettes (R. 37, 45). Plaintiff stated he had attempted to work during November and December, 2008, but could not due to pain and the side effects of medication (R. 39). Plaintiff testified he was a transport driver for the Department of Human Services from the third or fourth quarter of 2007 until the summer of 2008 (R. 48). Plaintiff stated that "sitting and the driving . . ., it just eats my back" (R. 49). He would have to stop every fifteen (15) or twenty (20) minutes during the transport due to pain (R. 50). Plaintiff testified he could shower and care for his hair independently. Plaintiff stated he could shop and did "some" cooking (R. 39).

25

Plaintiff did not sweep, vacuum, or work on cars. He played board games and watched television (R. 40). Plaintiff could occasionally do laundry, dust, take trips with his family, visit with family and friends, attend church, and sing as a soloist in the church choir (R. 41-42). Plaintiff stated he could not walk one (1) mile, but he could walk one-quarter (1/4) of a mile (R. 40). Plaintiff stated he could not "even hold a cup of coffee in his hands in the morning" due to swelling (R. 58). Plaintiff testified he had difficulty sitting down on and getting up from the toilet (R. 59). Plaintiff experienced fecal incontinence two (2) or three (3) times monthly (R. 59-60). Plaintiff testified he could sit for ten (10) or fifteen (15) minutes before having to stand or lie down for thirty (30) minutes. Plaintiff stated he could stand and/or walk for a total of ninety (90) minutes in an eight (8) hour work day (R. 61). Plaintiff testified he could stand for ten (10) or fifteen (15) minutes and his ability to bend and stoop was limited (R. 62). Plaintiff's mother tied his shoes (R. 63). Plaintiff could mow "portions" of grass on a riding lawn mower when his "medications [were] working real good" (R. 68).

Plaintiff testified he returned to high school, after having quit, to obtain his diploma. Plaintiff received hydraulic training while in the military. Plaintiff took "tech" courses in carpentry (R. 43). Plaintiff stated he resided on the family farm, which the family wanted to give to him (R. 46).

Plaintiff testified he had lost thirty-five (35) pounds in the past two (2) years, which he attributed to hepatitis C and hydromorphone, the medication he took for that condition (R. 38). Plaintiff stated he could not work due to pain and diminished concentration (R. 39). Plaintiff testified his pain was located in his lower back, hips and legs; it was continuous (R. 55). Plaintiff stated his pain level was five (5) or six (6) with medication. His medication caused dry mouth, loss of appetite, sleepiness, restlessness, and difficulty concentrating (R. 56). Plaintiff testified he had pain in his hips,

legs and hands (R. 64). Plaintiff stated his legs were "sore," felt "tight," and had "no strength in them whatsoever." Plaintiff stated he used his cane seventy-five (75) percent of the time (R. 65).

Plaintiff stated he used a TENS unit, was treated at a pain clinic, but had not been treated by a chiropractor since 2007 (R. 41). Plaintiff testified he walked with a cane, which was not prescribed; however, his doctor told him to use one if he needed assistance (R. 54-55). Plaintiff stated his psychiatrist, Dr. Sharf, prescribed Seroquel to help him sleep and for anxiety (R. 57). Plaintiff stated he soaked in a tub of hot water for treatment of his back pain. Plaintiff did exercises twice weekly (R. 58). Plaintiff testified he had never received treatment for hepatitis C "because my doctor told me that as long as I don't drink and drug and because I haven't really experienced any real heavy symptoms" (R. 71). Plaintiff had never undergone back surgery, gone to the emergency room for treatment of his back symptoms, or been hospitalized due to his back condition. Plaintiff had never had any psychiatric hospital admissions (R. 72).

Plaintiff testified he was incarcerated for armed robbery (R. 68). Plaintiff was subsequently jailed twice for probation violations (R. 70). Plaintiff testified that he had not used illegal drugs since June, 2004 (R. 71).

The ALJ asked the VE the following hypothetical:

> If you take a hypothetical person of the claimant's age, education, background, and work experience who could do a range of light work with a sit/stand option. Standing for a period of one hour taking five minute breaks as needed at the end of that period. Occasional posturals, no climbing of ropes, ladders, scaffolds, or anything of that nature. Needs to avoid extreme of cold, vibrations, hazards such as dangerous moving machinery, and unprotected heights. Needs to be able to ambulate reasonably, on reasonably level terrain or surfaces and my (sic) use a cane to ambulate at times. No working in industries where food is used for consumption or in medical services or medical providers. Also needs an entry level unskilled job. Routine and repetitive work, simple instructions with things as opposed to people. Limited contact with the public, no more than occasionally. And no production line

work. . . . Are there any occupations in the economy at the light or sedentary level that such a hypothetical person could perform? (R. 73-74).

The VE responded that such a hypothetical person could do the following light and sedentary work: laundry folder, of which there were 50,000 jobs nationally and 650 regionally; garment maker and sorter, of which there were 90,000 jobs nationally and 1,100 regionally; machine tender, of which there were 141,000 jobs nationally and 1,400 regionally; and general sorter, of which there were 50,000 jobs nationally and 550 regionally (R. 75).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (1997), ALJ Cannon made the following findings:

1. The claimant has not engaged in substantial gainful activity since April 10, 2007, the application date (20 CFR 416.971 *et seq.*) (R. 21).

2. Since April 10, 2007, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited his ability to perform basic work activity for a period of at least 12 consecutive months: degenerative disc disease, hepatitis C, mild depression, anti-social disorder, and a history of polysubstance dependence, in remission by report (20 CFR 406.920(c)) (R. 21).

3. Since April 10, 2007, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926) (R. 22).

4. Since April 10, 2007, the claimant has had the residual functional capacity to perform a range of entry level, unskilled work activity that: requires no more than a "light" level of physical exertion; affords a sit/stand option and accommodates the need to stand one hour followed by five minutes breaks as needed; requires no climbing of ladders, ropes or scaffolds, or more than occasional performance of other postural movements (i.e. balancing, climbing ramps/stairs, crawling, crouching, kneeling and stooping); entails no concentrated or frequent exposure to temperature extremes, vibration, or hazards (e.g. dangerous machinery, unprotected heights); requires ambulation

only on reasonably level terrain or surfaces; allows for occasional ambulation with a cane; involves no work in industries were food is used for consumption or with medical services or providers; involves only routine and repetitive tasks with things as opposed to people; involves only simple instructions; involves no more than occasional contact with the public; and involves no production line work (20 CFR § 416.967(b)) (R. 22-23).

5.     Since April 10, 2007, the claimant has lacked the ability to perform the requirements of any past relevant work (20 CFR 416.965) (R. 27).

6.     The claimant is appropriately considered for decisional purposes as a "younger individual age 18-49", (sic) on the date the application was filed (20 CFR 416.963) (R. 27).

7.     The claimant has a high school education and is able to communicate in English (20 CFR 416.964) (R. 27).

8.     The claimant has a "skilled/semiskilled" work background but since April 10, 2007, has laced the residual functional capacity to engage in or sustain any "skilled/semiskilled" work activity. Thus he has acquired no particular skills that are transferable to any job that has remained within his residual functional capacity (20 CFR 416.968) (R. 27).

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a) (R. 27).

10.    The claimant has not been under a disability, as defined in the Social Security Act, at any time since April 10, 2007, the date the application was filed (20 CFR 416.920(g)) (R. 28).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305

U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial

evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting *Laws v. Celebrezze*,

368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Secretary's decision, the reviewing court must

also consider whether the administrative law judge applied the proper standards of law:  "A factual

finding by the ALJ is not binding if it was reached by means of an improper standard or

misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B.  Contentions of the Parties

Plaintiff contends:

1. The ALJ's decision does not follow the mandates set forth in *Cook v. Heckler*, 783 F.2d 1168 (4th Cir. 1986), requiring that the criteria of the listing be applied to the evidence of record and a clear cogent opinion offered as to why the applicable listing(s) is not met (Plaintiff's brief at p. 12).

2. The ALJ erred in failing to give appropriate weight to the opinion of the primary care physician (Plaintiff's brief at p. 14).

3. The ALJ's substantial evidence does not support a RFC at the light exertional level as found by the ALJ and used as premise for the hypotehtical question posed to the VE (Plaintiff's brief at p. 14).

4. The ALJ erred by failing to recognize the side effects of claimant's medications and, therefore, did not properly evaluate the issue of credibility under SSR 99-7p (Plaintiff's brief at p. 15).

5. The Appeals Council erred in failing to remand the claim upon the new and material evidence submitted (Plaintiff's brief at p. 16).

The Commissioner contends:

1. Substantial evidence supports the ALJ's finding that Plaintiff could perform the limited range of light and sedentary work identified by the VE (Defendant's brief at p. 6).

## C. Analysis

### Treating Physician

Coen contends the ALJ did not "give appropriate weight to the opinion of the primary care physician.

The primary care physician is Precilla Famularcano, M.D. The record reflects Dr. Famularcano rendered the following opinions relevant to Coen: 1] On June 29, 2007 Dr Famularcano wrote: Plaintiff "definitely ha[d] a discogenic disk disease and is experiencing constant or chronic pain. Fortunately, it responds to medication." (R. 338); 2] On March 25, 2008 Dr. Famularcano stressed the "importance of daily adherence of medication administration" (R. 374); 3] On April 24, 2008 Dr. Famularcano opined that Plaintiff had chronic back pain caused by discogenic disk disease; Dr. Famularcano found Plaintiff could not work full time; Dr. Famularcano found that, within a work situation, Plaintiff should avoid lifting, bending, standing and sitting "for a long time;" Dr. Famularcano opined Plaintiff's "[d]uration of inability to work full time" was indefinite (R. 378); Dr. Famularcano opined that Plaintiff was "at the stage that can't perform customary work or employment due to the limitation he can do due to his back problem" (R. 379); 4] On March 5, 2009 Dr. Famularcano found Plaintiff was incapable of performing any full-time job and was specifically incapable of performing any full-time work from January 2, 2007, to the date of the questionnaire. Dr. Famularcano opined that Plaintiff was unable to work "[d]ue to pain . . . pt. experienced due to abnormality of lumbar spine" (R. 429).

With respect to Dr. Famularcano's opinions the ALJ stated:

"The undersigned has considered the opinion of the claimants' treating physician, Precilla Famularcano, M.D., a general practitioner, and declines to give it controlling weight (Exhibits 14F and 91F). Dr. Famularcano opined the claimant is unable to perform work activity on a full time basis due to his pain. The undersigned finds this opinion is inconsistent with the medical evidence of record, including Dr. Famularcano's examinations and physical findings, and the claimant's statements of his daily activities." (R. 26).

A physician's opinion that a claimant cannot work or is disabled cannot be given controlling weight or even special consideration. See Social Security Ruling ("SSR") 96-2p. However, that Ruling also provides:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983). In Craig v. Chater, 76 F.3d 585, 590(4th Cir. 1996), the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

> > [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

> [4,5] By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

The undersigned concludes that there is substantial evidence in the record to support the ALJ's decision not to give Dr. Famularcano's opinion controlling weight because 1) "it is inconsistent with the medical evidence of record";  2) it is inconsistent with "Dr. Famularcano's examinations and physical findings"; and, 3) it is inconsistent with "the claimant's statements of his daily activities."

With respect to the opinions of Dr. Famularcano being inconsistent with her own examinations and physical findings the undersigned notes the following substantial evidence from the record:

1) March 30, 2007 Dr. Famularcano conducted a review of a MRI noting only "mild annular bulge at the level of L4" and "some minimal disk protrusion on the level of the lubosacral interspace with some central neural compression at this level", that another physician had recommended "conservative management like physical therapy, TENS unit, use of nonsteroidal anti-inflamatory, avoidance of long term narcotics, and also referral for possible epidural injection.  Dr. Famularcano did a physical exam noting findings largely based on Coen's own reactions or reports of pain and limitation of motion.  No diagnostic tests were performed.   Dr. Famularcano referred Coen for pain management and prescribed hydromorphone. (R. 338).  2) Coen was referred on examination but without any diagnostic testing for pain management  and hydromorphone on July 27, 2007; for hydromophone on August 24, 2007, September 26, 2007, October 24, 2007, November 30, 2007, December 27, 2007, January 25, 2008, for hydromorphone and Duragesic patch on March 25, 2008, July 16, 2008, August 14, 2008, September 10, 2008, and October 7, 2008. (R . 341, 342, 343, 347, 348,, 385, 375, 412, 410, 408, and 406).  Dr. Famularcano's treatment regimen [in addition

to the pain medication heretofore noted, weight loss, and exercise including physical therapy] over the year and a half of treatment suggest she believed that Coen's condition could be managed and improved (R. 373, 416, 414, 409, 403, 412, 408, 406) and was "fortunately [responding] to medication." (R. 339). Repeated instruction to exercise regularly, to "walk at least a mile a day for exercise" (R. 373) is consistent with Dr. Famularcano's opinion that Coen could perform light work which "included a significant amount of walking and standing, lifting 10 pounds frequently and up to 20 pounds occasionally, or sitting most of the time pushing and pulling" ( R. 423) but is inconsistent with her opinion that he was unable to work "due to pain ... due to abnormality of lumbar spine." (R. 429). Moreover that same opinion is inconsistent with her opinion that Coen could not perform sedentary work which including "[s]itting most of the time, walking and standing occasionally, lifting no more that (sic) 10 pounds." (R. 423). Finally, the undersigned notes that during the 18 month treatment duration, in spite of Coen's continuing complaints of pain Dr. Famularcano noted on 8 separate occasions that Coen was "in no distress" and/or Coen's joints and muscles were "unremarkable" and or Coen's neurological examination was "unremarkable" and or Coen's Muscle tone was normal. (R. 416, 414, 412, 410, 405, 406, 402, and 400).

With respect to the opinions of Dr. Famularcano being inconsistent with the medical evidence of record, in addition to the above, the undersigned finds the following substantial evidence from the record: July 8, 2009 MRI showing "degenerative changes with diffuse disc bulges L4-5 and L5-S1" with no "disc herniation or spinal stenosis" (R. 519, 529 ); seen and hospitalized August 26-31, 2009 for a rash that Coen noted while mowing grass on Saturday and Sunday with normal neurological examinati0n ( R. 532 ); seen by Dr. Whitehair

September 2, 2009 because of complaints of swelling of joints and rash but reported his back pain was better ( R. 571); seen September 9, 2009 by Dr. Whitehair and wanted pain medications because he had been working in the garden digging potatoes ( R. 573-575 ); in spite of complaints of back pain from September 8 to September 23rd,  Coen did not have a positive Babinsky or Clonus (R. 581); October 5, 2009 Coen was again at Stonewall Jackson Hospital for symptoms associated with hepatitis and stated he could no longer work as a plumber even though his strength and sensation in his bilateral upper lower extremities showed normal strength and sensation (R. 681-682); experienced back pain shoveling snow in December 2009 and was treated with narcotics (R. 790); from January 2010 through October 2010 Coen was treated for pain and symptoms associated with Hepatitis C and reported Dilaudid was "relieving pain well" (R. 791).  In substance, a review of the record from 2009 and 2010 reflects Coen was being treated with pain medications but his complaints were largely for symptoms related to Hepatitis and only when he exerted himself in the garden, shoveling snow or mowing the grass and/or needed more narcotics did he complain of back pain.  Other than physical exams which were largely negative, no other diagnostic testing was performed relative to his back pain claims.

With respect to the opinions being inconsistent with the hearing testimony of daily activities, the undersigned notes the following substantial evidence: Coen has not gone to the emergency room, been hospitalized or had surgery for his back pain condition (R. 72); Coen's use of a cane is not prescribed (R 54-55); Coen could mow portions of his lawn using a riding mower when his pain medications are working (R. 68); Coen occasionally does laundry, dusts,

takes trips with his family, visits with his family, friends, attends church, and sings as a soloist in the church choir (R. 41-42).

Moreover, the undersigned finds the ALJ, while not giving controlling weight to the opinions of Dr. Famularcano, the ALJ did include limitations consistent with those treated by the Doctor in the residual functional capacity used in the hypothetical questions posed to the VE.

## RFC - Light Exertional Level

At the fifth step of the sequential evaluation, "the burden shifts to the [Commissioner] to produce evidence that other jobs exist in the national economy that the claimant can perform given his age, education, and work experience." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). The ALJ must consider the claimant's RFC, "age, education, and past work experience to see if [he] can do other work." 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

The ALJ may rely on VE testimony to help determine whether other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1566(e), 416.966(e). The Fourth Circuit has held that "[t]he purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir.1993) (citing Walker v. Bowen, 876 F.2d 1097, 1100 (4th Cir.1989)).

If the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. Edwards v. Bowen, 672 F. Supp. 230, 235 (E.D.N.C. 1987). The reviewing court shall consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir. 1993).

The ALJ concluded Coen had residual functional capacity to perform work at the light exertion level and asked the VE if there were jobs in the national economy in the light category that an individual with the following limitations could perform:

claimant's age,

claimant's education (high school diploma, hydraulic training in the military, and tech courses in carpentry (R. 43),

claimant's background,

claimant's work experience,

entry level unskilled work, routine and repetitive work,

simple instructions,

involving work with things not people,

no more than limited [occasional] contact with people,

no production line work,

sit/stand option,

occasional posturals,

no climbing ropes, ladders, scaffolds, or anything of that nature,

avoidance of extremes of cold, vibrations, hazards [dangerous moving machinery, and unprotected heights],

ambulate reasonably on reasonably level terrain or surfaces,

use of cane to ambulate at times, and

no working in industries where food is used for consumption or medical services or providers. (R. 73-74).

20 CFR § 404.1527(f)(2)(i) provides:

Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

The regulations clarify that ALJs "are responsible for reviewing the evidence and making findings of fact and conclusion of law." 20 C.F.R. § 416.927(f)(2). In doing so, the ALJ must consider the findings of state agency consultants as evidence from a non-examining physician, but he is "not bound by any findings made by state agency medical or psychological consultants, or other program physicians or psychologists." 20 C.F.R. § 416.927(f)(2)(i). In

39

evaluating a consultant's findings, the ALJ must consider the consultant's expertise, supporting evidence in the case file, the explanations of physicians of record, "and any other evidence relevant to the weighing of opinions." 20 C.F.R. § 416.927(f)(2)(ii).

In Koonce v. Apfel, 166 F.3d 1209 (4th Cir 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record.

In accord with the foregoing law and on review of the record in this case, the undersigned finds the following substantial evidence supports the ALJ's residual functional capacity and hypothetical question to the VE and therefore rejects Coen's complaint that the ALJ's decision is unsupported by substantial evidence and that she improperly adopted RFC for light work rejecting the PCP's (primary care physician) opinion and Coen's subjective complaints:

1)    The ALJ considered Coen's activities of daily living: doing laundry, carrying out the trash, riding a lawn mower (for short periods of time) (R. 68), cleaning (R. 39), cooking (R. 39), driving a car (R. 37, 45, 49-50), shopping once a week (R. 39, 37, 45), attending church twice a week (R. 41-42), singing at church (R. 41-42), playing a guitar and banjo (Ex. 6E), visiting with family and friends, making trips with his mother (R. 41-42), walk a 1/4 mile (R. 62), sit for ten or fifteen minutes before standing or lying down for thirty minutes (R. 62), and stand and or walk for 90 minutes of 8 hour work day (R. 61).

2)      Two state agency physicians conducted physical residual functional capacity assessments of Coen. The first was conducted by Dr. Franyutti on August 7, 2007 (R. 317-324) and the second was conducted by Dr. Pascasio on February 19, 2008 (R. 350-357).

Each of them found Coen to be capable of performing light type work with limitations which were adopted by the ALJ and included in the hypothetical to the VE. In fact, the ALJ was more liberal than the State Agency Dr.'s with respect to the limitations included in the RFC used in the hypothetical question posed to the VE. The ALJ found the independent assessments of the two state agency physicians not inconsistent with the RFC of light exertional activity with limitations. (R. 26). The ALJ justified the additional limitations included in the RFC from the objective medical evidence and other longitudinal evidence of record. (R. 26).

3)      Based on the findings of Dr. Famularcano and Coen's own statements recorded by his treating physician that his symptoms of pain and of hepatitis C were controlled by medications supports the RFC determination of the ALJ. ( R. 339, 312, 314).

4)      Dr. Famularcano's prescribed treatment was exercise and narcotic drugs. The undersigned concludes Dr. Famularcano would not prescribe regular exercise (April 24, 2008 - walk at least a mile a day R. 373, May 22, 2008 - exercise regularly R. 416, June 19, 2008 - exercise regularly R. 414, July 16, 2008 - exercise regularly R. 412, September 10, 2008 - exercise regularly R. 408, October 7, 2008 - "exercise, physical therapy, and other non-medicinal therapies [were] important parts of the treatment plan...." R. 406, December 2, 2008 - "exercise, physical therapy, and other non-

medicinal therapies [were] important parts of the treatment plan...." R. 403, January 20, 2009 - "exercise, physical therapy, and other non-medicinal therapies [were] important parts of the treatment plan...." R. 400) if she did not believe Coen capable of performing it as part of his treatment regimine. If a symptom can be reasonably controlled by medication or treatment, it is not disabling. Gross v. Heckler, 785 F.2d 1163 (4th Circ. 1986).

5) In the Primary Care Physician Questionaire completed by Dr. Famularcano on March 5, 2009, she concluded Coen could perform light work, which included a "significant amount of walking and standing, lifting 10 pounds frequently and up to 20 pounds occasionally, or sitting most of the time pushing and pulling."[1] (R. 423).

## Credibility

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

In Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1984), the Fourth Circuit held:

. . ., the ALJ did not just rest on the absence of objective proof

of pain. In an extended, comprehensive discussion, he cited

many additional reasons, all derived from the circumstances of

---

[1]It must be noted that Dr. Famularcano's PCPQ is ambiguous at best. On the one hand she opines Coen is capable of light work while on the other hand opines he is not capable of sedentary work and is disabled.

Mickles' everyday life, for finding her testimony not credible.

. . .

(3) Mickles used only relatively mild over-the-counter medication for her joint pain, . . . .

The only fair way to weigh a subjective complaint of pain is to examine how the pain affects the routine of life. *See Hunter v. Sullivan*, 993 F.2d 31 (4th Cir. 1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen supported ALJ's inference that claimant's pain was not as severe as he asserted).

Craig v. Chater, 76 F.3d 585, 592, the Fourth Circuit stated:

. . . for disability to be found, an underlying medically determinable impairment resulting from some demonstrable abnormality must be established. While the pain caused by an impairment, independent from any physical limitations imposed by that impairment, may of course render an individual incapable of working, *see Myers v. Califano*, 611 F.2d 980, 983 (4th Cir. 1980), allegations of pain and other subjective symptoms, without more, are insufficient. As we said in *Gross v. Heckler*,'[p]ain is not disabling *per se*, and

subjective evidence of pain cannot take precedence over objective medical evidence or the lack thereof.' 785 F.2d 1163, 1166 (4th Cir. 1986) (quoting *Parris v. Heckler*, 733 F.2d 324, 327 (4th Cir. 1984); *see also* 20 C.F.R. §§ 416.928(a) & 404.1528(a) ('[A claimant's] statements . . . alone . . . are not enough to establish that there is a physical or mental impairment.')

In order to make this statutory requirement even more plain, Congress in 1984 amended Title II of the Social Security Act, purportedly to codify the regulatory standard for evaluating pain. *See* S.Rep.No. 466, 98th Cong., 2d Sess. 23-24 (1984); H.R. Conf. Rep. No. 139, 98th Cong., 2d Sess. 29 91984), *reprinted in* 1984 U.S.C.C.A.N. 3080, 3087-88. The amendment, in language which closely paralleled the secretary's 1980 regulations, *see* 20 C.F.R. §§416.929 & 404.1529 (1983) provides that

> [a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show

the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all the evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability. Objective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory diagnostic techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability.

The Fourth Circuit also noted in Craig:

This is not to say, however, that objective medical evidence and other objective evidence are not crucial to

evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers:

> We will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled. We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your medical history, the medical signs and laboratory findings, and statements by your treating or examining physician or psychologist or other persons about how your symptoms affect you. *Your symptoms, including pain, will be determined to diminish your capacity for basic work activities . . . to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.*

Id. at 595-596.

First, the undersigned concludes the ALJ followed the law as set forth in Craig and the

46

regulations (20 CFR §416.929(c)[2] and SSR 96-7p[3]).  (R. 23-24).

---

[2]Section 416.929(c) states:

> In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements from you, your treating or examining physician or psychologist, or other persons about how your symptoms affect you.
>
> (3) Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

[3]SSR 96-7p states:

> PURPOSE: The purpose of this Ruling is to clarify when the evaluation of symptoms, including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effect; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision. In particular, this Ruling emphasizes that:
>
> > 1. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the

47

individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

2. When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

. . .

4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case records. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

SSR 96-7p further provides:

In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:

The individual's daily activities;

Second, the ALJ utilized the following information from the record to conclude that Coen was not entirely credible relative to his claims of debilitating pain: 1) Coen uses a cane 75% of the time but it was not prescribed for him (R. 23); 2) Coen takes pain medication but has not had surgery (R. 23); 3) Coen's use of a riding lawn mower and driving to various activities, doing laundry, singing at church, carrying out the trash, attending church, playing a banjo and guitar are consistent with the ALJ's functional capacity assessment and are inconsistent with Coen's claimed limitations (R. 23-24); While the ALJ found Coen's primary physician noted some tenderness in the L5-S1 joints and decreased range of motion in the spine, the record reflects his gait was normal, muscle tone was normal, and he did not require an ambulatory aid (R. 24).

---

1. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

2. Factors that precipitate and aggravate the symptoms;

3. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

4. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

5. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

6. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Third, Coen's history of substance abuse coupled with his questionable use of prescription and not prescribed drugs: while being prescribed hydrocodone for pain, on September 26, 2007 he tested positive for opiates (R335); November 30, 2007 Dr. Smith wrote Coen "needs new PCP (primary care physician) or no other narcotics (R. 325); on December 27, 2007 he tested positive for opiates (R332, 334, 417-19); March 25, 2008 Dr. Famularcano stressed the "important of daily adherence of medication administration" (R. 374); October 7, 2008 Dr. Famularcano informed Coen that "early refills and /or replacement of lost prescriptions may not be performed..." (R. 406); December 2, 2008 Famularcano informed Coen that "early refills and /or replacement of lost prescriptions may not be performed..." (R. 403); January 20, 2009 Famularcano informed Coen that "early refills and /or replacement of lost prescriptions may not be performed..." (R. 400); and his criminal history (R. 389-390); is substantial evidence in the record supporting the ALJ's questioning of Coen's motivation for requesting pain medications as part of the credibility analysis. (R. 24).

Moreover, the ALJ properly considered Coen's checkered work history in evaluating his credibility finding that his "mediocre to poor work record" (R. 395) in combination with his felony criminal background (R. 389, 390, 391) made it difficult for him to find employment and therefore a motivation to seek disability. (R. 25).

The ALJ considered many factors instead of relying solely on the lack of objective medical evidence of pain in deciding the credibility issue. The undersigned is not permitted to look behind a credibility determination which is supported by substantial evidence and proper legal analysis.

**Medication Side Effects**

In addition to the above elements SSR 99-7p requires "a finding on the credibility of the individual's statements about symptoms and their effects" as reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4). "These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record."    "The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;...." SSR 99-7p.

Coen complains that the ALJ failed to recognize the side effects of his medications and therefor did not properly evaluate the issue of credibility. The undersigned disagrees.

In his decision the ALJ noted: "As to the type, dosage, effectiveness and side effects of medication taken to alleviate pain or other symptoms, the claimant was prescribed Percocet and Dilaudid (Exhibits 4F/5 and 9F/1). Side effects reported are a dry mouth, dizziness, constipation, lack of concentration and sweating (Exhibits 3E/6 and 4E/2). The undersigned (ALJ) believes the above listed residual functional capacity accommodates these side affects adequately." (R. 24).

During the administrative hearing the ALJ asked Coen: "Do you have any particular affects [sic] from the pain medications themselves? Coen responded that he had "Dry mouth, loss of appetite, sleepiness, restlessness, difficulty in concentrating." (R. 56). Counsel for Coen did not ask questions of Coen to elaborate how, if at all, these side effects impacted

Coen's activities of daily living or functional capacity. The record is devoid of any evidence that the side effects of the medications as described by Coen impacted his ability to function. Counsel in briefing before this Court does not explain from the record how the side effects of medications Coen was taking impacted his functional capacity. All counsel did was concede that the ALJ "acknowledged that the side effects of any medication were accommodated within the RFC" but complains without more that the ALJ "provides no further explanation." (DE 15 at 16). In Hayes, 907 F.2d at 1456 (quoting Seacrist v. Weinberger, 538 F.2d 597 (4th Cir. 1976), the Fourth Circuit noted "it is the responsibility of the Secretary and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of nonpersuasion." Absent any evidence of how the side effects of his medication may have impacted his functional capacity, the undersigned finds the ALJ more than accommodated the effects testified to by Coen in the RFC.

**New Evidence**

In Wilkins v. Secretary, 953 F.2d 93 (4th Cir. 1991), the Fourth Circuit determined that the Appeals Council will consider evidence submitted to it if the evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision. Wilkins further defined the terms "new" and "material" as follows:

> Evidence is new . . . if it is not duplicative or cumulative . . . .
> Evidence is material if there is a reasonable possibility that the
> new evidence would have changed the outcome.

Id. at 96.

The administrative hearing was held on March 3, 2009. (R. 33-84). At the request of Coen's counsel, the ALJ left the record open for 10 days (approximately March 14, 2009) for submission of additional medical records. After receiving the May 29, 2009 adverse

decision from the ALJ, Coen appealed to the Appeals Council. During the appeal, Coen submitted medical records from visits to doctors and medical facilities dating from May 27, 2009 (two days before the ALJ's decision) through November 24, 2010. (These additional medical record submissions are outlined in pages 17 - 25 of this Report and Recommendation). The Appeals Council denied Coen's appeal on February 11, 2011.

Coen contends the evidence submitted to the Appeals Council was relevant to the determination of disability at the time his application was first filed in April 2007 because "[t]he lion's share of the evidence ... related back to the diagnosis of hepatitis C - showing the disease to be active and producing symptoms" and would have been relevant to the ALJ because "it is only reasonable that the decision might reasonably been different had the ALJ had the benefit of this evidence, particularly sisnce she made the specific finding that 'there is no indication that it [hepatitis C] would prevent him from performing work activity at the above residual functional level." (DE 15 at p 17 citing R. 24).

Commissioner contends the post decision evidence does not meet the requirements for new evidence remand because: 1) the "'new' evidence does not meet the materiality requirement because most of it does not relate to the time period for which benefits were denied" at the ALJ level; 2) if it is pre-decision evidence Coen has not shown good cause for its submission and consideration post decision; 3) the "new" evidence shows a post decision deterioration of Coen's condition at best. (R. DE 17 at 9-12).

A review of the records submitted by Coen as "new" evidence leads the undersigned to the same conclusion as the Commissioner - they do not represent new and material evidence. From May 27, 2009 to August/September 2009 they are largely a continuation of

Coen's long history of seeking prescription pain medications from physicians for "chronic back pain" (ie. 5/27/09 functional ranges of motion in all four extremities - likely the last time that [she][would] fill narcotic prescription" ( R. 527-28); 6/24/09 mowed grass three days earlier - prescribed hydromorphone and toradol) (R. 524-25); 7/1/09 prescribed hydromorphone and noted Coen was "aware will no longer fill narcotics at this clinic" (R. 523); 7/8/09 MRI "degenerative changes with diffuse disc bulges L4-5 and L5-S1" but no "disc herniation or spinal stenosis" (R.. 519, 529); 8/26/09 leg rash post mowing law sends Coen to hospital where tests reveal fairly unremarkable labs, some slightly elevated liver enzymes and leukocytoclastic vasculitis (swelling) of the legs bilaterally - prescribed oxycodone, hydromorphone, Seroquel, Solu-Medrol and Rocephin (R. 532-541); 9/2/09 no ankle swelling and back pain was better (R. 571); 9/9/09 Coen requested Rx of Dilaudid - working in garden digging potatoes - Dr noted would not refill Dilaudid after this visit (R. 573-575); 9/8/09 small sub-calcaneal spur left foot - received epidural injection for relief of complaint of pain, numbness, burning and tingling left foot (R. 567)).

Starting with the August 26, 2009 leg rash and vasculitis (noted above and continuing thereafter the medical records note exacerbated symptoms of Hepatitis C indicating at best that the largely previously asymptomatic condition was deteriorating. However, in spite of Coen's August report of increased bruising but ""no major bleeding" and other symptoms, when examined on September 23, 2009 the doctor Found the skin and tissues of the head, neck, chest, breast, back abdomen, genitalia and extremities without rashes, lesions, ulcers or photo damage. (R. 580-581). Three days later (September 26, 2009) Stonewall Jackson hospital doctors noted spots/petechiae on both lower extremities to the groin resulting in

intervenous steroid treatment. (R. 585-600). These complaints and treatments continued through December 2009. (medical records noted herein on p. 21-22). December 14, 2009 Coen entered into a Chronic Narcotic/Medication Contract with Lively Health Care Center for lumbar pain and hepatitis C. ( R. 787). The remaining records reflect monthly visits to Lively between January 2010 and November 2010 for Dilaudid and hydromorphone (approximately 8 refill requests). From October 2010 to November 2010 Coen was seen and evaluated by Dr. Elliott who was not providing pain medications in spite of Coen's November attempt to get him to do so. (see medical records noted on p. 24-25 hereof).

The so called "new evidence insofar as it related to Coen's back pain complaints is found by the undersigned to be cumulative of the evidence already of record prior to the ALJ decision and therefore not material. Wilkins v. Secretary, 953 F.2d 93 (4th Cir. 1991).

With respect to the hepatitis C, the evidence submitted by Coen shows a worsening of the pre-existing diagnosed condition from approximately 9 months post ALJ decision to the end of 2010. That evidence does not show Coen was disabled by the hepatitis C condition for the time period before the ALJ decision. Mitchell v. Schweiker, 699 F.2d 185, 188 (4th Cir. 1983). Accordingly, the evidence is not material to the issue before the ALJ. If anything, it could be used to buttress a new disability claim filed by Coen asserting disability onset from September 2010.

To remand for consideration of the evidence Coen presented to the Appeals Council and more than a year post ALJ decision is tantamount to allowing Coen to prosecute a different and later disability claim based on the original disability claim filing date even though there is substantial evidence that Coen was not disabled under his original claim.

Simply stated, permitting remand would frustrate the appeal process and delay decision. The appeal process is for the purpose of determining whether the ALJ applied the correct law and did not abuse his or her discretion in the fact finding process. Szubak v. Secretary of Health and Human Servs., 745 F.2d 831, 833 (3rd Cir. 1984). The line is therefore drawn at the ALJ decision. This is not a just excuse or "good cause" case. Since all but one of the medical visits and thus the medical records submitted as "new evidence" had not yet occurred and did not exist until after the ALJ decision, they could not have been produced. Moreover, the so called "new evidence" is simply irrelevant because it relates to the period after the date of the ALJ decision and not before. 42 USC §423(b), 42 USC §405 (g), Willis v. Secretary of Health and Human Servs. 727 F.2d 551, 554 (6th Cir. 1984).

For these reasons the undersigned finds no error in the Appeals Council's decision.

## Listing

In paragraph #3 of the decision the ALJ concluded Coen did not have "an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart 4, Appendix 1 ...." ( R. 22). In support of the conclusion the ALJ stated: 1) she had "evaluated medical and other evidence pertaining to claimant's medically determinable impairments in conjunction with all the relevant severity criteria contained within the 1.00 musculoskeletal system and 5.00 digestive system series of listed impairments"; 2) with "regard to 1.04, ... , there is some evidence of central neural compression, but no objective evidence to show any motor loss with sensory or reflex loss, no evidence of inflamed arachnoidal tissue resulting in need for a change of position of posture every two hours, or evidence of stenosis that results in an inability to ambulate

effectively necessary [sic] that is necessary to meet or medically equal the criteria of Listing 1.04"; 3) considered Coen's obesity and found that, while his obesity may be reasonably anticipated to produce or contribute to symptoms of back or other musculoskeletal pain and to generally limit mobility and stamina, it did not, in combination with any other severe impairment meet a listing. (R. 22).

Coen complains that the ALJ did not take each element of the listing and apply the facts from the medical record with respect to it in his decision contending the failure to do so is a violation of <u>Cook v. Heckler</u>, 783 F.2d 1168 (4th Cir. 1986).

Listing 1.04:

**1.04** *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

1. A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

OR

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Coen's complaint is misguided with respect to listing 1.04. The ALJ specifically addressed A. Nerve root compression noting that there was evidence of central neural

compression, but no objective motor loss with sensory or reflex loss. She further addressed B. spinal arachnoiditis noting there was no evidence of inflamed arachnoidal tissue resulting in need for a change of position of posture every two hours. Finally, she addressed C. by stating there was no evidence of stenosis that results in an inability to ambulate effectively. (R. 22). These findings of the ALJ are substantiated by the medical evidence of record which has already been adequately referred to in this report and recommendation.

However, the ALJ did not specifically address the elements of Listing 5.0. In particular the ALJ did not do any analysis of the elements of listing 5.00D 4 (a)(i) and (ii). At a minimum Cook, *supra*, requires: "The ALJ should have identified the relevant listed impairments. He should then have compared each of the listed criteria to the evidence of Cook's symptoms. Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination."

Contrary to the argument of the Commissioner, there is nothing on which the undersigned could conduct a reasonable determination that the ALJ, in reaching the conclusion that Coen's symptoms relative to his hepatitis C did not meet or equal the listing, considered the required listing elements and applied the symptoms to them. Had the ALJ ( R. 22, par. 3) mentioned the key words of each element of the 5.0 listing dealing with hepatitis and applied to it the symptoms or lack thereof in the record, as she did with the 1.04 listing, the undersigned would have been able to conduct a proper review. However, paragraph 3 is silent as to the factors of listing 5.0 even though the record is replete with references to a hepatitis C diagnosis and treatment of pain secondary thereto.

Accordingly, the undersigned concludes that the ALJ's decision with respect to listing 5.0 was insufficiently reasoned to allow for meaningful judicial review and requires remand solely for the purpose of reviewing the medical evidence of record at the time of the ALJ decision and application of that evidence to the 5.0 listing for hepatitis C.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is not supported by a proper analysis with respect to whether Plaintiff's symptoms met or equaled a listing and I accordingly recommend that the Defendant's Motion for Summary Judgment be DENIED IN PART **and that this matter be remanded solely for the purposea of reviewing the medical evidence of record at the time of the ALJ decision and the application of that evidence to the 5.0 listing for hepatitis C to determine whether Plaintiff's symptoms met or equaled the listing.** In all other respects I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is supported by substantial evidence and was arrived at by the correct application of law and accordingly recommend that Defendant's Motion for Summary Judgment be **GRANTED IN ACCORD THEREWITH.** Consistent with the foregoing recommendation, I further recommend that Plaintiff's Motion for Summary Judgment be **DENIED with respect to all claims of error except for the claim that the ALJ failed to properly review and apply the evidence of record at the time of decision to the listing for hepatitis C (5.0) and with respect to that failure, I further recommend that Plaintiff's motion for summary judgment be GRANTED in part.**

Any party may, within fourteen (14) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Proposed Findings of Fact and Recommendation for Disposition to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Proposed Findings of Fact and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record

Respectfully submitted this 30th day of December 2011.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE